<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

BILLY A. STEWART, *pro se*,

            Plaintiff,

v.

UNION BOARD OF EDUCATION, a
corporate body of the State of New Jersey, and
NICHOLAS ARDITO, individually,

            Defendants.

Case:  2:13-cv-00800 (SDW-SCM)

**OPINION**

September 23, 2015

**WIGENTON**, District Judge.

       Before this Court is a Motion for Summary Judgment filed by the Union Board of Education ("Union BOE") and Nicholas Ardito ("Ardito") (collectively, "Defendants") pursuant to Federal Rule of Civil Procedure ("Rule") 56.  Jurisdiction is proper pursuant to 28 U.S.C. § 1331.  Venue is proper pursuant to 28 U.S.C. § 1391.  This opinion is issued without oral argument pursuant to Federal Rule of Civil Procedure 78.  For the reasons stated herein, Defendants' Motion for Summary Judgment is **GRANTED**.

**FACTUAL BACKGROUND**[1]

The Union BOE is a corporate body of the State of New Jersey in Union, New Jersey. (Am. Compl. ¶ 2.)  It maintains a Non-discrimination and Affirmative Action Policy ("Policy") that ensures the provision of equal employment opportunities without regard to race, religion, sex, or other protected characteristics ("protected characteristics"); prohibits harassment, discrimination, or retaliation based on protected characteristics; instructs employees to report concerns related to harassment, discrimination, or retaliation; subjects individuals who have engaged in harassment, discrimination, or retaliation to disciplinary action, including termination; and encourages employees to report violations of its Policy.  (Alvarez Decl., Ex. 4.)  It also has a Collective Bargaining Agreement ("CBA") with the Union Township Education Association ("UTEA").  (*Id.*)

Plaintiff is an African-American male who was first employed by Union BOE in 1994 as a substitute teacher.  (Alvarez Decl., Ex. 1, ¶ 13; Ex. 2, Vol. I, 71:6–13.)  In 1997, Plaintiff was hired as a full-time security officer at the Union Township High School ("High School").  (Am. Compl. ¶ 14; Alvarez Decl., Ex. 2, Vol. I, 70:5–21).  Until 2010, security officers employed by Union BOE were supervised by the Principals and Vice Principals of the school to which they were assigned. (Stewart Dep. Tr., Vol. I, 78:18–20; 83:14-84:2; Ardito Aff., ¶ 7.)  Vice Principal David Shaw ("Shaw") supervised the High School's security officers, including Plaintiff, from 1997 through 2010.  (*Id.* at 78:25–79:13.)

---

[1] Plaintiff neglected to respond to Defendants' Rule 56.1 Statement of Material Facts. Accordingly, Defendants' Statement is admitted as "uncontroverted."  *See Abulkhair v. Bush*, 2010 U.S. Dist. LEXIS 59027, *14-15 (D.N.J. 2010) (quoting L. Civ. R. 56.1(a)) (noting that any material fact that the non-moving party fails to dispute "shall be deemed undisputed for purposes of the summary judgment motion"); *Malik v. Hannah*, 799 F. Supp. 2d 355, 356 (D.N.J. 2011).

On September 1, 2010, Union BOE hired Ardito as its first district-wide Director of Security. (Am. Compl. ¶ 15; Alvarez Decl., Ex. 2, Vol. 1, 78: 18–20, 83:14–84:2; Ardito Aff., ¶ 5.) As Director of Security, Ardito had two functions: (1) to "provide leadership in the security and protection of pupils, staff, and school property" and (2) to "assign, direct, and review the work of security guards." (Alvarez Decl., Ex. 3.)

Plaintiff alleges that Ardito engaged in racially-motivated adverse employment and retaliatory actions against him. These discriminatory actions allegedly include unfavorable work assignments, unwarranted disciplinary actions, and harassment.

***Outdoor Patrol Duty***

First, Plaintiff alleges that Ardito "deliberately assigned [him] and the only other African-American security guard to work outside duty, especially during the winter, when the conditions were unbearable despite the normal security guard rotation of location assignments." (Am. Compl. ¶ 17(b).)   However, Plaintiff admitted at his deposition that he had been assigned to patrol the outdoor perimeter of the High School even before Ardito's arrival.  (Stewart Dep. Tr., Vol. I, 138:11–22, 145:8–13, 157:15-20, 164:15–165:3.)   Plaintiff's co-workers also testified that Plaintiff informed them that he had been hired by the Union BOE to patrol areas outside the school building. (Alvarez Decl., Ex. 12, ¶ 7; Ex. 13, ¶ 7; Ex. 14, ¶ 9; Ex 15, ¶ 11.)  A review of Plaintiff's work schedule confirms that both Vice-Principal Shaw and Director Ardito assigned Plaintiff to outdoor patrol duty.  (Compare Alvarez Decl., Ex. 11, 2009-2010 Security Officer Assignment Schedule ("2009 Schedule"); Ex. 17, 2010-2011 Security Officer Assignment Schedule ("2010 Schedule").)  Further, Plaintiff admitted that he generally received identical assignments from Ardito as he did from Shaw.  (Stewart Dep. Tr., Vol. I, 142:2–5.)  Lastly, Plaintiff testified that he

did not believe there was anything wrong with being assigned to outside duty and that the assignment did not offend him.  (*Id*. at 164:15–165:3, 170:14–20.)

***Dress Code Violation***

Plaintiff alleges that Ardito, motivated by racial animus towards African Americans, "disciplined [him] for a dress code violation when other security guards were not."  (Am. Compl. ¶ 17(d).)

On August 12, 2010, the Union BOE changed the dress code to require that all security officers wear a uniform.  (Alvarez Decl., Ex. 20, Memorandum; Ardito Aff., ¶ 19.)  The Union BOE informed all security officers of the uniform requirement on September 1, 2010, the date on which the new policy became effective.  (Ardito Aff., ¶ 19; Stewart Dep. Tr., Vol. I, 130:18–25, 133:8–23; Alvarez Decl., Ex. 21.)  On October 4, 2010, Plaintiff wore black jeans to work, in violation of the dress code policy, apparently because he had stayed the night with his mother and did not have his uniform with him. (Stewart. Dep. Tr., Vol. I, 193:23–25.)  Consequently, Ardito instructed Plaintiff to go home and return in the appropriate attire.  (Ardito Aff., ¶ 20–21; Stewart Dep. Tr., 195:1–196:13.)  Plaintiff testified that because he lived an hour away from work, he took a break, went to Walmart to purchase an appropriate pair of pants, and was able to return to work. (Id.)

Plaintiff alleges, however, that two other officers who had previously violated the dress code received more favorable treatment on the basis of race.  Plaintiff alleges that Officer Carlos Esquivel was not told to go home or otherwise reprimanded when he wore blue and orange sneakers with blue pants to work. (Stewart Dep. Tr., Vol. I, 187:3–10.) Officer Esquivel denied that he ever appeared at work out of uniform. (Esquivel Aff., ¶ 24.)  Plaintiff also alleges that

Officer James Frazier, who is African-American, was not disciplined for appearing out of uniform. (Stewart Dep. Tr., Vol. I, 190:19–191:15, 198:1–15) Frazier, however, testified that Plaintiff is referring to an incident that occurred in November of 2011,  when Frazier and "many participating members" of UTEA—a workers' union for educators employed by Union BOE—wore jeans to work "as part of a union-related action".  (Frazier Aff., ¶¶ 23–24.)    According to Frazier, all participating members received written reprimands for the dress code violation, and the reprimands were only lifted after a grievance process. (Id.)

### *Monitoring and Absence from Post*

Plaintiff alleges that Ardito, motivated by race, placed Plaintiff "under heightened scrutiny and followed [him] around in a harassing manner to ascertain [his] location, which was not done to other security guards."  (Am. Compl. ¶ 17(c).)  On January 11, 2011, Ardito issued Plaintiff a written reprimand after surveillance cameras revealed that Plaintiff left his post for fifty-five minutes without notice or prior consent from his supervisors.  (*Id.* ¶ 19; Ardito Aff. ¶¶ 24, 26) However, the reprimand was removed from Plaintiff's file following a grievance process. Critically also, the reprimand had no adverse effect on his compensation or benefits, and did not alter the terms and conditions of his employment. (Am. Compl. ¶ 19; Ardito Aff., ¶ 30; Alvarez Decl., Ex. 26, January 31, 2011 Memorandum.)  During his deposition, Plaintiff agreed that his unexcused absence from his post was a breach of his duty.  (Stewart Dep. Tr., 283:14–23.)

### *Transfer within the District*

Plaintiff alleges that his transfer from the High School to a Union BOE middle school was racially motivated. (Am. Compl. ¶ 21; Stewart Dep. Tr., Vol. II, 453:7–12.) On September 1, 2010,

all Union BOE security officers were notified that they would be periodically rotated through Union BOE schools to prevent security officers from becoming overly familiar with one particular school and its students. (Ardito Aff. ¶¶ 31–32; Stewart Dep. Tr., Vol. I, 130:18–25, 134:6–19; Frazier Aff. ¶ 5; Solla Aff. ¶¶ 4–5; Marano Aff. ¶¶ 5-6; Desrosiers Aff. ¶ 5; Lateriner Aff. ¶ 6; Esquivel Aff. ¶¶ 7–8.)    On February 4, 2011, Plaintiff, along with a Caucasian security officer, Officer Solla, were transferred from the High School to Kawameeh and Burnett Middle Schools, respectively.  (Ardito Aff. ¶33; Alvarez Decl. Ex. 27, February 4, 2011 Memorandum.)  Officers Esquivel, of Hispanic descent, and Frasier, an African-American, were transferred from those middle schools to the High School. (*Id.*)

Ardito cited the following reasons for transferring the officers: (1) Esquivel, who is fluent in Spanish, was transferred to the High School to assist with the growing number of Spanish-speaking students at the High School; (2) it was more convenient for Frazier, who was Vice-President of the UTEA at the time, to be stationed at the High School, where UTEA-related events were often held; and 3) Plaintiff and Solla were transferred to the middle schools because of their "ability to communicate with students and overall skills and experience."  (Ardito Aff. ¶¶ 34–39; Esquivel Aff. ¶ 10.)

***Overtime***

Plaintiff alleges that Ardito "deliberately made an attempt to reduce or eliminate the amount of overtime available to [Plaintiff] by changing the historical way overtime is distributed and by bypassing [Plainitff's] seniority."  (Am. Compl. ¶ 17(a).)  To that end, Plaintiff alleges that Ardito purposely skipped Plaintiff for an overtime assignment on February 9, 2011.  (Stewart Dep. Tr., Vol. I, 214:25–216:9, 244:8–13.)   In addition, Ardito allegedly switched the policy for

6

distributing overtime, resulting in an alleged limitation in Plaintiff's capacity to obtain overtime. (*Id*.) Plaintiff alleges that these overtime incidents were in retaliation against Plaintiff for filing a grievance with the Equal Employment Opportunity Commission ("EEOC") ("EEOC Charge") on February 23, 2011.  (Am. Compl. ¶ 22–23, 26.)

Before Plaintiff's transfer to the Middle School, overtime was available exclusively for security officers working at the High School and regulated by a so-called "building-based" system. (Ardito Aff. ¶ 42; Frazier Aff. ¶ 9; Solla Aff. ¶ 11; Marano Aff. ¶¶ 14-15; Lateiner Aff. ¶ 12; Esquivel Aff. ¶ 13.)   Under the "building-based" system, overtime at the High School was distributed amongst the officers assigned to the High School, beginning with the most senior officer. (Id.)   Around the same time as the personnel transfers occurred, Union BOE switched from a "building-based" overtime allocation system to a "district-wide" scheme in which overtime opportunities rotated among security officers throughout the entire district.  (Alvarez Decl. ¶ 10; Ardito Aff. ¶ 43 Solla Aff. ¶ 12; Marano Aff. ¶ 16; Lateiner Aff. ¶ 13; Esquivel Aff. ¶ 14.)  Plaintiff testified that but for the change from building-based to district-wide overtime allocation, Plaintiff would not have received overtime "at all."  (Stewart Dep. Tr., Vol. I, 232:13–21.)

Nevertheless, Plaintiff alleges that he received less overtime under the district-wide scheme than prior to his transfer (Dkt. No. 63, 8.)  Under the district-wide scheme, overtime is assigned to all of the Union BOE officers in the order that their first names appear on an alphabetical list. Plaintiff alleges that Ardito inappropriately used Plaintiff's nickname ("Tony") rather than his given name ("Billy"), which placed him lower on the list.  (*Id*.)  Plaintiff admits that his co-workers and his wife generally referred to him as "Tony".  (Stewart. Dep. Tr. Vol. I, 29:4–6, 30:4–57:18, 58:1–22; Frazier Aff. ¶ 12; Solla Aff. ¶ 14; Marano Aff. ¶ 17; Lateiner Aff., ¶ 15; Esquivel Aff., ¶ 16.)

In May 2012, the district-wide overtime scheme was reversed to "building-based, on a rotating seniority system[,]" pursuant to a change in the CBA requested by the UTEA. (Ardito Aff. ¶ 49; Stewart Dep. Tr. Vol. I, 250: 23–251:16; Alvarez Decl. Ex. 27, May 8, 2012 E-mail; Ex. 38, 2012 Modification to the CBA.) Plaintiff testified that he did not believe that the changes that were made to the overtime allocation systems in general were related to his race. (Stewart Dep. Tr. Vol. I, 260:17–20.)

### *Questioning Related to Purchases by the Athletic Department*

Plaintiff alleged that Ardito "inappropriately harassed and questioned [him] with regard to an investigation of items purchased [in 2011] by the athletic department and asked only [Plaintiff] if [he] received anything of value other than the standard issue security officer T-shirts." (Am. Compl. ¶ 17(e).)

Despite the allegations in his complaint, during his deposition, Plaintiff admitted that he did not believe that this questioning was motivated by race, that the investigation was conducted by a Union BOE official and UTEA representative rather than Ardito, and that multiple security officers were similarly questioned. (Stewart Dep. Tr. Vol. I, 210:11–16, 209:15–20, 214:11–19; Frazier Aff. ¶ 15; Solla Aff. ¶ 15; Marano Aff. ¶ 19, Desrosiers Aff. ¶ 15; Lateiner Aff. ¶ 18; Esquivel Aff. ¶ 19; Ardito Aff. ¶ 50; Alvarez Decl. Ex. 39, 2011 Questionnaires and Interview Notes.)

### *Coaching*

During his tenure with Union BOE Plaintiff occasionally coached the football and track teams. Plaintiff alleges that in retaliation for filing an EEOC charge, Ardito "inhibited [his] ability to leave school early to coach track and football." (Am. Compl. ¶ 24.)

However, Plaintiff testified during his deposition that he last coached football in 2004, that he did not indicate to Defendants his desire to coach football in 2011, and did not request a special schedule from Defendants to leave early in order to coach football in 2011.[2]  (Stewart Dep. Tr. Vol. II, 463:2–11, 473:5–474:4; Ardito Aff. ¶ 54.)

On February 4, 2011, Plaintiff met with Jason Malanda, Vice Principal of the Middle School to which Plaintiff had been transferred, to establish a schedule that would have enabled Plaintiff to leave work early to coach the track team in the spring semester.  (Ardito Aff. ¶ 52; Alvarez Decl. Ex. 40, February 24, 2011 Memorandum.)  Pursuant to the proposed schedule, Plaintiff would have been permitted to leave work at 3:00 p.m. for away track meets, 3:30 p.m. for home track meets, and 3:30 p.m. each day for track practice—at least thirty minutes earlier than Plaintiff's contractual work hours.  (Alvarez Decl. Ex. 40, February 24, 2011 Memorandum; Stewart Dep. Tr. Vol. II, 367:6–17, 368:3–19; 371:5–19.)  Plaintiff refused the proposed schedule because he believed that it was "entrapment."  (Stewart Dep. Tr. Vol. II, 371:20–372:16.)  Nevertheless, Plaintiff testified that he did in fact leave work fifteen minutes early each day during the spring of 2012 in order to coach the track team.  (Stewart Dep. Tr. Vol. II, 374:10-375:22.)


***Racial Comments by Ardito***

Plaintiff alleges that Ardito made comments indicative of discriminatory animus against African-Americans.  (Am. Compl., ¶ 18(a)-(b).)  "Shortly after Thanksgiving break 2010," Plaintiff overheard Ardito describe Vice Principal Hamburg as a "go to person because they can't say he is prejudice [sic], because he is married to a black woman." ("Vice Principal Comment")

---

[2] Although Plaintiff claims that he was prevented from coaching football due to his hours at Kawameeh Middle School, the Court notes that Plaintiff cites to no evidence in the record to substantiate this claim.  (Dkt. No. 63, 6.)

(*Id.*)  Plaintiff alleges that this comment is indicative of bias because "a slave master will go in and rape a black woman [because] he likes black women. . . . Preference has nothing to do with prejudice."  (Stewart Dep. Tr. Vol. II, 508:25–510:25.)

In addition, Plaintiff alleges that in December of 2010, when Ardito overheard two Caucasian students referring to each other "with the term 'nigger[,]'"  Ardito responded, "they can't use the 'N' word . . . they aren't even black" ("'N' Word Comment").  (Am. Compl., ¶ 18(b).)


**PROCEDURAL HISTORY**

On February 23, 2011, Plaintiff *pro se* filed a charge of race discrimination and unlawful retaliation in violation of Title VII with the Equal Employment Opportunity Commission ("EEOC") and the New Jersey Division on Civil Rights ("DCR").  (Am. Compl. ¶ 8; Alvarez Decl. Ex. 7.)  On November 8, 2012, the EEOC notified Plaintiff of his right to sue within 90 days of the receipt of the notice.  (Alvarez Decl. Ex. 9.)

Plaintiff filed a complaint in the District Court on February 7, 2013, amended on February 15, 2013, in which he alleges four causes of action: discrimination on the basis of race under Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. 2000 *et. seq.* ("Count I"); retaliation under Title VII; discrimination under the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. §§ 10:5-1 *et. seq.* ("Count III"); retaliation under the NJLAD ("Count IV").  (ECF No. 4, Am. Compl.  ¶¶ 35–50.)  Plaintiff seeks punitive damages under the NJLAD.  (*Id.* ¶ 50(e).)

On April 2, 2015, Defendants filed the instant Motion for Summary Judgment.  (ECF No. 59.)  Plaintiff opposes the motion.  (ECF No. 63.)

**LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The dispute is not genuine if it merely involves "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Not every issue of fact will be sufficient to defeat a motion for summary judgment; issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). Further, the nonmoving party cannot rest upon mere allegations; he must present actual evidence that creates a genuine issue of material fact. *See* Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249 (citing *First Nat'l Bank v. Cities Serv. Co*., 391 U.S. 253, 290 (1968)). In conducting a review of the facts, the non-moving party is entitled to all reasonable inferences and the record is construed in the light most favorable to that party. *Hip Heightened Indep. & Progress, Inc. v. Port Auth. of New York & New Jersey*, 693 F.3d 345, 351 (3d Cir. 2012). Accordingly, it is not the Court's role to make findings of fact, but to analyze the facts presented and determine if a reasonable jury could return a verdict for the

nonmoving party. See *Brooks*, 204 F.3d at 105 n. 5 (citing *Anderson*, 477 U.S. at 249); *Big Apple BMW v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

**DISCUSSION**

*a. Statute of Limitations*

Defendants assert that Plaintiff's claims are time-barred because he filed his complaint more than 90 days after the EEOC issued its Notice of Right to Sue letter.  (Defendants' Brief in Support of Motion for Summary Judgment ("Defs' Br."), p. 5.)  In order to maintain an action under Title VII of the Civil Rights Act of 1964, a plaintiff must file his complaint with the District Court within 90 days of the date of the EEOC's right to sue notice.  42. U.S.C. § 2000e-5(f)(1); *Burgh v. Borough Council of Borough Montrose*, 251 F.3d 465, 470 (3d Cir. 2001) (citations omitted).

The EEOC notice is dated November 8, 2012, and was presumably sent on that date.  Although Plaintiff cannot cite a particular date of receipt, it is reasonable to assume that Plaintiff did not receive the notice on the same date that it was sent.  As such, Plaintiff likely received the notice no earlier than November 9, 2012.  Plaintiff filed his Complaint in this Court on February 7, 2013, which is within 90 days of November 9, 2012.  Nonetheless, because this Court will address the merits of Plaintiff's claims, Plaintiff's complaint will be deemed timely.

*b. Claims Against Ardito in his Individual Capacity*

Plaintiff alleges discrimination and retaliation under Title VII and the NJLAD against both Union BOE and Ardito, in his individual capacity, in each count of his complaint.  This Court will dismiss all claims against Ardito.

No individual liability lies under Title VII.  *Le v. Univ. of Pa.*, 321 F.3d 403, 409 n. 3 (3d Cir. 2003) (citation omitted) (finding no congressional intent "to hold individual employees liable under Title VII.").  Only employers may be held liable for discrimination under Title VII. *Id.*  Here, Plaintiff and Ardito are both employees of Union BOE.  Since Ardito is not Plaintiff's employer, this Court will dismiss all Title VII claims asserted against Ardito in his individual capacity.

The New Jersey LAD similarly limits the imposition of civil liability against individual employees.  Under the NJLAD, a supervisory employee may only be held liable if he "aids and abets" the employer's unlawfully discriminatory conduct.  *See Tarr v. Ciasulli*, 181 N.J. 70, 82–83 (2004); N.J.S.A. 10:5-12(e).  An employee who is a "principal wrongdoer . . . cannot aid and abet his own wrongful conduct."  *See Newsome v. Admin. Office of Courts*, 103 F. Supp. 2d 807, 823 (D.N.J. 2000).  Given that Ardito is the alleged principal wrongdoer, he cannot aid and abet his own actions and thus cannot be held individually liable under the LAD.  (*See generally* Am. Compl.)

Thus, this Court will dismiss Plaintiff's claims insofar as they are directed at Ardito in his individual capacity.

### c. Counts II and IV: Plaintiff's Retaliation Claims

Plaintiff alleges that Defendants retaliated against Plaintiff for filing an EEOC Charge by (a) changing the overtime policies from a building-based to a district-wide overtime allocation scheme and by (b) preventing Plaintiff from coaching track and football.

To establish a prima facie case of retaliation under Title VII and the NJLAD, a plaintiff must show that: (1) he engaged in a protected activity; (2) the employer took an adverse employment action against him; and (3) his participation in the protected activity caused the

adverse employment action.  *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006); *Craig v. Suburban Cablevision*, *Inc*., 140 N.J. 623, 629–30 (1995).

Plaintiff cannot sustain a claim of retaliation regarding Union BOE's overtime policy change, effective February 4, 2011, as the changes occurred before he filed an EEOC charge on February 23, 2011. (Alvarez Decl. ¶ 10; Solla Aff. ¶ 12; Marano Aff. ¶ 16; Lateiner Aff. ¶ 13; Esquivel Aff. ¶ 14; Ex. 27, February 4, 2011 Memorandum.)  Plaintiff was allegedly "skipped" for overtime duty by Ardito on February 9, 2011, which also predates the filing of his EEOC charge.  Because retaliatory actions, by their nature, must necessarily occur after a plaintiff has engaged in a protected activity, this Court finds that neither the overtime policy change nor the alleged "skipping" of which Plaintiff complains were retaliatory in nature.

The Court next evaluates Plaintiff's retaliation claim relating to the alleged inhibition of Plaintiff's ability to coach the football and track teams.  The record shows that Plaintiff last coached the football team in 2004 and that he expressed no desire to coach football in 2011. (Stewart Dep. Tr. Vol. II, 463:2–11, 473:5–474:4; Ardito Aff.; ¶ 54.)  Plaintiff also rejected the proposed coaching schedule that would have enabled him to leave work thirty minutes before the end of his shift in order to coach the track team in the spring semester of 2011. (Alvarez Decl. Ex. 40, February 24, 2011 Memorandum; Stewart Dep. Tr. Vol. II, 371:20–372:16.)

The facts presented, when read in the light most favorable to Plaintiff, do not support either of Plaintiff's retaliation claims. Therefore, Defendants are entitled to summary judgment with respect to Counts II and IV of the complaint.

#### d. Counts I and II: Racial Discrimination under Title VII and NJLAD

Plaintiff alleges unlawful racial discrimination under Title VII and the NJLAD in Counts I and III, respectively. Both claims are subject to the same legal standard. *Davis v. City of Newark*, 285 F. App'x 899, 903 (3d Cir. 2008); *Zive v. Stanley Roberts, Inc.*, 182 N.J. 436, 447 (2005). Whether asserted under Title VII or NJLAD, an employment discrimination claim is evaluated through the burden-shifting framework established and later modified in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973):

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (internal citations and quotation marks omitted).

To satisfy the initial burden of establishing a prima facie case, Plaintiff must show by a preponderance of the evidence that he is (1) a member of a protected class; (2) was qualified for the position; (3) was subjected to an adverse employment action despite being qualified; and (4) under circumstances giving rise to an inference of discrimination. *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003). This burden is "a low bar" that is easily met. *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006).

Plaintiff, an African-American, is a member of a protected class—which satisfies the first prong of the prima facie test.

Regarding the second prong, the fact that Plaintiff has been employed as a security officer by the Union BOE since 1997 implies that he is qualified for the position. Furthermore, Union BOE indicated that Plaintiff was transferred to the Kawameeh Middle School for his "ability to communicate with students and overall skills and experience." (Ardito Aff. ¶¶ 34-39; Esquivel Aff. ¶ 10.)

As to the third element, although Plaintiff subjectively believes that he suffered an adverse employment action, an employee's subjective beliefs do not inherently establish that adverse employment action occurred. *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1083 (3d Cir. 1992) (internal citations omitted) (finding that "employment discrimination laws . . . cannot be transformed into a palliative for every workplace grievance, real or imagined"); *Mallet v. Potter*, No. 05-5586, 2008 WL 724348, at *4 (D.N.J. March 17, 2008) (stating that "Plaintiff's subjective preferences cannot be used to show that he suffered an adverse employment action."). An adverse employment action "must be serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *See Caver v. City of Trenton*, 420 F.3d 243, 255 (3d Cir. 2005) (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997));[3] *Jackson v. Gannett Co.*, No. 08-6403, 2011 WL 3362154, at *8 (D.N.J. Aug. 3, 2011) (internal quotation marks and citations omitted) ("[O]therwise, minor and even trivial employment actions that an irritable chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.")

Plaintiff alleges that Defendants engaged in the following adverse employment actions: (1) assignment to outside guard duty during the winter; (2) citation for a dress code violation;

---

[3] Although the *Robinson* Court dealt with an allegation of retaliation, it cited to *McDonnell v. Cisneros*, 84 F.3d 256, 258 (7th Cir. 1996) for the proposition that adverse employment actions are held to the same standard for both retaliation and employment discrimination claims.

(3) heightened monitoring and citation for absence from an assigned work area; (4) harassing questioning related to school purchases; (5) transfer to a less desirable school; and (6) changes in overtime policies that adversely affected Plaintiff.[4]  (Am. Compl., ¶¶ 17-19.)  None of these actions constitute an adverse employment action.

First, Plaintiff admitted at his deposition that he had been assigned to outside duty well before Ardito became his supervisor. (Alvarez Decl. Ex. 12, ¶ 7; Ex. 11, 2009 Schedule; Ex. 13, ¶ 7; Ex. 14, ¶ 9; Ex 15, ¶ 11; Ex. 17, 2010 Schedule"; Stewart Dep. Tr. Vol. I, 142:2–5.) Nonetheless, where, as here, the alleged adverse action results in no reduction of the employee's compensation or change to his employment status, the action will not be considered materially adverse.  *See Gitto v. City of Atlantic City*, 2013 N.J. Super. Unpub. LEXIS 1013, *13 (App. Div. May 2, 2013) (internal quotations and citations omitted) (holding that "a job reassignment with no corresponding reduction in wages or status is insufficient to qualify as a cognizable adverse employment action.") *See also Scott v. New Jersey*, 143 Fed. Appx 443, 446–47 (3d Cir. 2005) ("[A] lateral transfer involving 'no reduction in pay and no more than a minor change in working conditions' does not qualify as adverse employment action.").

Second, there is no evidence to suggest that Plaintiff was improperly reprimanded for the dress code violation.  Plaintiff admitted that he was duly notified of the uniform requirement and that he wore jeans to work in contravention of the policy. Furthermore, Plaintiff remediated the problem by purchasing appropriate work attire during a short break and was able to return to work that day.  Importantly, however, the written reprimand that

---

[4]Since the Court finds that there was no materially adverse employment action, it need not consider whether Ardito's "Vice Principal" and "N Word Comments" provide a basis for inferring that Ardito harbored discriminatory animus against African-Americans.

Plaintiff received for the dress code violation was rescinded following a grievance process and had no practical effect on his compensation or employment status. (Ardito Aff. ¶ 20–21; Stewart Dep. Tr. Vol. I, 177:4–10.)

Third, the fact that Ardito cited Plaintiff for his admittedly unauthorized absence from his post merely suggests "the diligent work of a supervisor ensuring that [his] staff is working during work hours." (Alvarez Decl. Ex. 26, January 31, 2011 Memorandum; *Swangin v. Public Schools of Edison Township*, No. 03-4058(GEB), 2007 WL 1302486, at *15 (April 30, 2007)).

Fourth, Plaintiff was not singled out for questioning regarding the school purchases, as other security guards were similarly questioned. (Stewart Dep. Tr. Vol. I, 210:11–16, 209:15–20, 214:11–19; Frazier Aff. ¶ 15; Solla Aff. ¶ 15; Marano Aff. ¶ 19, Desrosiers Aff. ¶ 15; Lateiner Aff. ¶ 18; Esquivel Aff. ¶ 19; Ardito Aff. ¶ 50; Alvarez Decl. Ex. 39, 2011 Questionnaires and Interview Notes.) Therefore, the questioning was not discriminatory or racially motivated.

Fifth, Plaintiff's transfer to Kawameeh Middle School did not, as a matter of law, change the terms and conditions of his employment. (Alvarez Decl. Ex. 27, February 4, 2011 Memorandum; *Swangin*, at *34–35 (finding that a transfer to another school within the same school district did not amount to a materially adverse employment action where Plaintiff was never "suspended, furloughed, [demoted] or terminated" with no reductions in salary, benefits, applicable pay increments, or access to tenure); *Walker v. Centocor Ortho Biotech, Inc.*, 558 Fed. Appx. 216, 219 (3d Cir. 2014) (holding that "lateral transfers . . . have generally been held not to constitute adverse employment actions."). Accordingly, this Court finds that the transfer was not a materially adverse employment action.

Sixth, Plaintiff's unsubstantiated loss of an overtime opportunity on February 9, 2011, is too marginal to constitute an adverse employment action.  (Stewart Dep. Tr. Vol. I, 214:25–216:9, 244:8–13; *see Hudson v. Cleco Corp.*, 539 Fed. Appx. 615, 619 (5th Cir. 2013) (holding that the loss of two overtime opportunities is not an adverse employment action); *Rabinovitz v. Pena*, 89 F.3d 482, 488–89 (7th Cir. 1996) (holding that denial of a discretionary bonus is not a materially adverse action).  Further, but for the policy change, Plaintiff would not have had the opportunity to work overtime hours after his transfer to Kawameeh Middle School. (Stewart Dep. Tr. Vol. I, 232:13–21.)   Since the district-wide overtime policy change benefitted Plaintiff, this Court finds that it was not a materially adverse employment action.[5]

In sum, this Court finds that the facts presented, even when read in the light most favorable to the Plaintiff, do not establish a materially adverse employment action. As a result, this Court grants summary judgment regarding Plaintiff's Count I and Count III claims.

### e. Punitive Damages under the NJLAD

"Punitive damages should only be awarded under the NJLAD in exceptional cases" where "the wrongdoer's conduct is especially egregious. *See Catalane v. Gilian Instrument Corp.*, 271 N.J. Super. 476, 501 (App. Div. 1994) (denying punitive damages in a case where NJLAD was in fact violated); *see also Lehman v. Toys R Us, Inc.*, 132 N.J. 587, 624–625 (1993); *see also Jackson v. Gannett Co., Inc.*, No. 08-6403, 2011 WL 3362154, at *13 (D.N.J.

---

[5] The use of "Tony," Plaintiff's nickname, rather than his given name, on the rotation list does not change the fact that Plaintiff had access to those overtime opportunities.  Also, Plaintiff admitted that he was routinely referred to as "Tony" rather than "Billy" at work. As such, this Court finds that Ardito's use of Plaintiff's common moniker was not aimed at reducing Plaintiff's chances of obtaining overtime hours. Further, while the district-wide overtime scheme was in effect, every officer was allotted overtime based on the alphabetical list. In fact, Plaintiff testified that he had more overtime opportunities when it was divvied up district-wide than when it was "building-based." (Ardito Aff. ¶ 48; Stewart Dep. Tr. Vol. I, 232:13–233:1, 234:20–24; Esquivel Aff. ¶ 15.)

Aug. 3, 2011).   Since summary judgment has been granted as to Plaintiff's LAD claims,

Plaintiff's plea for punitive damages is effectively denied.


**CONCLUSION**

     For the reasons set forth above, the Motion for Summary Judgment is **GRANTED**.   An

appropriate order accompanies this Opinion.

s/ Susan D. Wigenton, U.S.D.J.

Orig:        Clerk
cc:           Steven C. Mannion, U.S.M.J.
              Parties